# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTRIM PHARMACEUTICALS, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Hon. Matthew F. Kennelly |
| vs. | ) ) | |
| BIO-PHARM, INC., a Pennsylvania corporation, | ) ) | Case No. 16-cv-00784 |
| Defendant. | ) ) ) | |
| BIO-PHARM, INC., a Pennsylvania corporation, | ) ) ) | |
| Counterclaimant, | ) ) | |
| vs. | ) ) | |
| ANTRIM PHARMACEUTICALS LLC, an Illinois limited liability company, | ) ) ) | |
| Counterclaim Defendant. | ) ) | |

## BIO-PHARM'S COMBINED MEMORANDUM
## IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO ANTRIM'S MOTION FOR SUMMARY JUDGMENT

John C. Gekas
Saul Ewing Arnstein & Lehr LLP
161 N. Clark Street, Suite #4200
Chicago, Illinois 60601
Tel: (312) 876-7124
john.gekas@saul.com

*Attorney for Bio-Pharm, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................ 1

LEGAL STANDARD ......................................................................................... 1

FACTUAL BACKGROUND.............................................................................. 2

ARGUMENT...................................................................................................... 4

   I.  BIO-PHARM IS ENTITLED TO SUMMARY JUDGMENT ON ANTRIM'S BREACH OF CONTRACT CLAIM (COUNT I)......................................... 4

      A.  There Was No Offer and Acceptance, or Meeting of the Minds, on Bio-Pharm's Equity Stake. ................................................................. 4

      B.  Antrim Did Not Agree to Pay Bio-Pharm's Price of $6.78 to Manufacture Escitalopram................................................................. 10

      C.  Bio-Pharm's Alleged Breach Did Not Cause Any Damages. ................. 11

         1.  Antrim does not have regulatory approval to sell Ondansetron. ................... 11

         2.  Antrim is not legally able to sell Escitalopram either....................................... 11

      D.  Antrim's Alleged Damages Are Barred by the New Business Rule. ..................... 13

   II.  IN THE ALTERNATIVE, BIO-PHARM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS FIRST AFFIRMATIVE DEFENSE OF MITIGATION.................................................................................................. 14

   III. BIO-PHARM IS ENTITLED TO SUMMARY JUDGMENT ON ANTRIM'S UNJUST ENRICHMENT CLAIM (COUNT III) BECAUSE THERE IS NO EVIDENCE THAT BIO-PHARM WAS UNJUSTLY ENRICHED......................... 15

   IV. ANTRIM'S MOTION FOR SUMMARY JUDGMENT ON BIO-PHARM'S COUNTERCLAIMS SHOULD BE DENIED............................................... 16

      A.  Bio-Pharm's Promissory Estoppel Counterclaim Seeks $277,000 in Detrimental Reliance. ....................................................................... 16

      B.  The Doctrine of Anticipatory Repudiation Precludes Antrim's Motion for Summary Judgment on Bio-Pharm's Breach of Contract Counterclaim. .......... 18

CONCLUSION .................................................................................................. 19

i

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ............................................................2

*Argonaut Ins. Co. v. Broadspire Servcs., Inc.,* No. 05 C 218, 2008 WL 4346418, *4.....................
(N.D. Ill. Mar. 25, 2008)...............................................................................................................16

*Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 832 (Ill. 2005) .......................................11

*Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014)............................................15

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 919 .............
(7th Cir. 2001)..............................................................................................................................18

*Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) ....................4

*Cleary v. Philip Morris, Inc.,* 656 F.3d 511, 518 (7th Cir.2011).....................................................15

*Clutch Auto Ltd. v. Navistar, Inc.*, 2015 WL 1299281, *8 (N.D. Ill. Mar. 19, 2015) ......................13

*Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill. App. 3d 254, 258 ....................
(2d Dist. 1982) .............................................................................................................................14

*Dillard v. Starcon Intern., Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) .................................................4, 6, 9

*Downs v. Rosenthal Collins Grp., LLC*, 2011 IL App (1st) 0909970, ¶ 49......................................10

*Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co.,* 637 N.E.2d 1103, 1108....................
(Ill. App. 1994) ...........................................................................................................................16

*Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869 (N.D. Ill. 2001).....................13

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) ...............................2

*Podolsky v. Alma Energy Corp.,* 143 F.3d 364, 369 (7th Cir.1998) .................................................4

*Prodromos v. Poulos*, 560 N.E.2d 942, 948 (Ill. App. 1990) .........................................................16

*PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728 (7th Cir. 2005).............................10

*Renteria v. Italia Foods, Inc.*, 2003 WL 21995190, at * 8 (N.D. Ill. Aug. 21, 2003) ......................
(Kennelly, J.) ............................................................................................................................2, 16

*Suson v. PNC Bank, Nat'l Ass'n*, No. 16 C 5450, 2017 WL 4390368, at *2 ...................................
(N.D. Ill. Oct. 3, 2017) (citing Fed. R. Civ. P. 56(a)) (Kennelly, J.)...............................................1

*TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 633 (7th Cir. 2007) ..........12, 15

*Tindall Corp. v. Mondelex Int'l, Inc.*, 2017 WL 1163879, *8 (N.D. Ill. Mar. 29, 2017) .................11, 13

*Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 940 (Ill. App. 2007) ..... 18, 19

*Zeller v. First Nat. Bank & Tr. Co. of Evanston*, 398 N.E.2d 148, 149 (Ill. App. 1979) .................4, 6

**SECONDARY AUTHORITY**

23 R. Lord, Williston on Contracts § 63:33, at 561 (4th ed.2002) ....................................................18

## INTRODUCTION

This case arises out of Antrim's claims for breach of an alleged oral agreement to manufacture two generic pharmaceutical products. For several reasons, Bio-Pharm is entitled to summary judgment on that claim. Chief among them is that (i) the Parties' objective conduct establishes that there was no offer and acceptance or meeting of the minds, (ii) Bio-Pharm's alleged breach did not cause any damages because Antrim was legally unable to sell either product, and (iii) Antrim's damages are barred by Illinois' new business rule.

Antrim has also pled a claim for unjust enrichment in the alternative, but Bio-Pharm is entitled to summary judgment on that claim as well. Antrim has no admissible evidence that Bio-Pharm has been enriched at all, much less unjustly.

Meanwhile, Antrim has also moved for summary judgment on Bio-Pharm's two counterclaims for promissory estoppel and breach of contract. Antrim's motion should be denied. *First*, Bio-Pharm's promissory estoppel claim seeks $277,000 in manufacturing costs incurred as a result of its detrimental reliance on Antrim's promises, not the lost value of equity as Antrim mistakenly contends. *Second*, Antrim's motion for summary judgment on Bio-Pharm's breach of contract counterclaim (which is alleged in the alternative) should be denied because Antrim disregards the doctrine of anticipatory repudiation. As a matter of law, Bio-Pharm was not obligated to turn over the Products to Antrim for commercialization as Antrim contends.

In sum, this case should be set for trial – but on Bio-Pharm's counterclaims only.

## LEGAL STANDARD

"A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Suson v. PNC Bank, Nat'l Ass'n*, No. 16 C 5450, 2017 WL 4390368, at *2 (N.D. Ill. Oct. 3, 2017) (citing Fed. R. Civ. P. 56(a)) (Kennelly, J.). The nonmoving party, in turn, must then "affirmatively

demonstrate, by producing evidence that is more than merely colorable, that there is a genuine issue for trial" to avoid summary judgment." *Id*. (citing *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011)). "A genuine dispute of material fact exists if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Finally, summary judgment is required where a party cannot prove an element on which it will bear the burden of proof at trial. *See Renteria v. Italia Foods, Inc.*, 2003 WL 21995190, at * 8 (N.D. Ill. Aug. 21, 2003) (Kennelly, J.).

## FACTUAL BACKGROUND

In or about 2008, plaintiff Antrim Pharmaceuticals (then operating as BrianT Labs) approached an Indian pharmaceutical company, third-party Zhaveri Pharmakem PVT, Ltd., to help Antrim develop the two products at issue in this case: (i) Escitalopram (the generic form of the anti-depressant, Lexapro); and (ii) Ondansetron (the generic form of the anti-nausea drug, Zofran, which together with Escitalopram are collectively referred to herein as the "Products"). (*See* Bio-Pharm's Rule 56.1 Statement of Undisputed Material Facts (hereinafter, "SOF") at ¶ 6.) After Antrim was introduced to Zhaveri, Zhaveri then introduced Antrim to Bio-Pharm, and specifically, introduced Brian Tambi of Antrim to Amit Shah of Bio-Pharm. (SOF ¶ 7.)

In 2009, the parties contemplated a three-way joint venture between Antrim, Zhaveri, and Bio-Pharm in which Zhaveri would lead the development process, Bio-Pharm would manufacture the Products, and Antrim would market and sell the Products. (SOF ¶ 9.) On or about December 31, 2009, Antrim, Zhaveri, and Bio-Pharm signed a written agreement "to pursue a business arrangement more specifically stated in and on substantially binding terms set

forth in the term sheet attached [t]hereto as Exhibit A (the "Term Sheet")." (SOF ¶ 10.)[1] At the time, the two Products at issue herein were the only products contemplated. (SOF ¶ 12.) As reflected by the Term Sheet, it was the intent of all three parties to come together and form a new business venture that they would all own a part of. (SOF ¶ 13.) As captured by the Term Sheet, Antrim would have a 60% equity stake in the joint venture, and Zhaveri and Bio-Pharm would each have a 20% equity stake. (SOF ¶ 14.)

By its own terms, the Term Sheet was to be "replaced by a final Definitive Agreement signed and executed by the parties hereto within ninety (90) days from the date of this Agreement." (SOF ¶ 15.) The original agreement further provided, that "[i]f no Definitive Agreement is reached within 90 days, the Parties shall either agree to extend the time needed to reach a Definitive Agreement, or any Party can walk away from the Project subject to the terms set forth in Paragraph 12 of [the Term Sheet]." (*Id.*) A "Definitive Agreement" was never signed and the Term Sheet lapsed, but not for any specific reason that Tambi knows (SOF ¶ 16.)

After the lapse of the Term Sheet, there was a falling out with Zhaveri, but Antrim and Bio-Pharm continued to collaborate. (SOF ¶ 17.) In May 2015, the FDA approved the Abbreviated New Drug Application (or "ANDA") for Escitalopram. (SOF ¶ 18.) Antrim (through Brian Tambi) and Bio-Pharm (through Amit Shah) then attempted to reduce their relationship to a written agreement, but could not agree on terms. (SOF ¶¶ 19-20.)  Bio-Pharm believed that it was entitled to a 25% *equity* stake. (SOF ¶ 21.) Antrim, on the other hand, claimed that Bio-Pharm's percentage was for net profits only, and did not include equity. (SOF ¶ 22.) After failing to resolve their disagreement, Antrim filed this lawsuit on January 19, 2016. (SOF ¶ 23.)

---

[1] The Parties also referred to the Term Sheet as the "MOU." (SOF ¶ 11.)

**ARGUMENT**

I.    **BIO-PHARM IS ENTITLED TO SUMMARY JUDGMENT ON ANTRIM'S BREACH OF CONTRACT CLAIM (COUNT I).**

    A.    **There Was No Offer and Acceptance, or Meeting of the Minds, on Bio-Pharm's Equity Stake.**

In order to form a valid contract under Illinois law, Antrim must prove both offer and acceptance, and a meeting of the minds. But neither one occurred here. Accordingly, Antrim's alleged oral agreement is unenforceable.

In Illinois, "it is elementary that for a contract to exist, there must be an offer and acceptance." *Zeller v. First Nat. Bank & Trust Co. of Evanston*, 398 N.E.2d 148, 149 (Ill. App. 1979). *See also Pine Top Receivables of Illinois, LLC v. Banco de Seguros del Estado*, 867 F.3d 709, 712 (7th Cir. 2017). "[T]o create a binding contract, an acceptance must comply strictly with the terms of the offer." *Zeller,* 398 N.E.2d at 149.

Illinois also requires a meeting of the minds. "For an oral contract to exist, the parties must have had a meeting of the minds with respect to the terms of the agreement and must have intended to be bound to the oral agreement." *Podolsky v. Alma Energy Corp.,* 143 F.3d 364, 369 (7th Cir.1998).   "Importantly, the intent to be bound is '**measured objectively**, by the parties' words and conduct,' not their stated subjective intent as to the meaning of the agreement." *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) (emphasis added). *See also Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007).

In this case, the Parties' objective conduct establishes that Bio-Pharm never agreed to the oral contract now claimed by Antrim. Brian Tambi of Antrim admits that the Parties' original contemplation and intent was "a new business venture that they would all own a piece of." (SOF ¶ 24.) Tambi also testified that he's not aware of any specific reason why the Term Sheet was

4

allowed to lapse without a definitive agreement. (SOF ¶ 16.) And he admitted that after the Term

Sheet lapsed, the Parties proceeded as if the Term Sheet were still in effect:

> Q.   And on what understanding did Bio-Pharm and
>      Antrim go forward?
>
> **A.   We had the understanding that Bio-Pharm – an**
>      **agreement that Bio-Pharm would continue to**
>      **manufacture the products, and they would**
>      **have -- that the -- there's a model – that**
>      **the model that was put forward right at the**
>      **very beginning was --**
>
> Q.   <u>From the term sheet?</u>
>
> **A.   <u>Yes.</u>**

(SOF ¶ 25. *See also* SOF ¶¶ 26-27.)[2]

The emails between Antrim and Bio-Pharm objectively document that understanding. For

example, on November 29, 2010, Tambi wrote Shah that "I suggested that we just follow the

MOU and I will see about making it an operational agreement," and Shah responded, "we are

fine with formalizing and reactivating the MOU." (SOF ¶ 28.)[3] On January 2013, Shah wrote to

Tambi that "[w]e would like to have a final agreement at the moment we just have the Term

Sheet." (SOF ¶ 29.) Tambi responded, "Hello Amit--Agreed--I will finalize the Agreement."

(*Id.*) And after the Parties dissociated themselves from Zhaveri, Antrim agreed to increase Bio-

Pharm's percentage from 20% to 25%. (SOF ¶ 31.) On May 29, 2014, Shah wrote Tambi that "I

appreciate you raising the **<u>profit share/equity</u>** to 25%." (SOF ¶ 30)

---

[2] Bio-Pharm's counsel recognizes the Court's policy disfavoring excess pages, and has tried to use the Court's leave judiciously by dedicating the majority of the extra length to including the pertinent deposition testimony within Bio-Pharm's memorandum so that the Court does not need to hunt for it in Bio-Pharm's statement of facts and the exhibits thereto.

[3] As noted above, Antrim admits that "MOU" was another way the Parties referenced the Term Sheet. (SOF ¶ 11.)

The Parties also exchanged written drafts of agreements. Notably, *every* draft sent by Bio-Pharm included an equity stake. (SOF ¶ 32.) For example:

- The 2009 Term Sheet provided Bio-Pharm with a 20% equity stake. (SOF ¶ 14.)

- On November 1, 2010, Shah sent Tambi a draft agreement, Section 2.2 of which provided that "[t]he Parties shall jointly own all right, title, and interest in the Products." (SOF ¶ 34.)

- On June 9, 2015 (and again on July 7), Shah sent Tambi a draft agreement that also provided for joint ownership of the Products. (SOF ¶ 35.)

- When Tambi asked Shah to send him the agreement that Shah had been relying on, Shah sent Tambi the 2009 Term Sheet. (SOF ¶ 36.)

These facts are undisputed. The Parties' communications and conduct establishes that Bio-Pharm never "accepted" any "offer" that did not include an equity stake in the Products. *See Zeller,* 398 N.E.2d at 149. Nor was there a meeting of the minds. Antrim's subjective beliefs are irrelevant. Measured objectively, Bio-Pharm never agreed to forsake its equity stake. *See e.g., Dillard*, 483 F.3d at 507 ("Whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs.'").

But there's more. Tambi is completely unable to testify to a coherent and consistent articulation of the alleged agreement. In addition to the parties *objective* conduct, Tambi's contradictory testimony further undermines Antrim's claim that a valid oral contract was formed. For example, Tambi cannot say if his alleged agreement is oral or written:

> Q. Was it an agreement that was only reached orally, or is it an agreement that was reduced to writing?
>
> **A. I'm not sure. I don't know.**

(SOF ¶ 37.)

Tambi further testified that that the "model" for his alleged oral agreement was based in his mind – and nothing else:

> Q.   Was the model based on the term sheet, or was there a new model?
>
> **A.   No, no. This is just a model. Not based entirely on the term sheet, but it was a model.**
>
> Q.   But what was the model based on?
>
> **A.   My mind.**
>
> Q.   Anything else?
>
> **A.   Nothing else.**

(SOF ¶ 38.) Yet Tambi does not know if the "model" that was 'in his mind' was the same or different from the Term Sheet:

> Q.   Okay. And it was a model that was different or the same from the model in the term sheet?
>
> [Objection]
>
> **A.   I cannot recall. I'd have to go and look at the term sheet to see what that was.**

(SOF ¶ 39.) Nor can Tambi say whether the model 'in his mind' formed a new relationship between Antrim and Bio-Pharm:

> Q.   And so you said you had hundreds of conversations with Amit about this model that you developed in your mind about the new relationship?
>
> **A.   Yes. We – No. We're -- I don't know whether we call it a new relationship. There was nothing new or old about the relationship. It was -- It evolved. Just every day we were doing work. We were working towards a common goal.**

(SOF ¶ 40.)

Tambi also admitted that Bio-Pharm/Shah never acknowledged, in writing, that Bio-Pharm did not have an equity position:

> Q.   It's your under – you – your testimony that
>      Amit [Shah] never said clearly in writing
>      that he understood that Bio-Pharm did not
>      have an equity position in Escitalopram,
>      correct?
>
> [Objection]
>
> **A.   …Right.**

(SOF ¶ 41.) Rather, as noted above, all of Shah's written communications demonstrate that he never agreed to forsake Bio-Pharm's equity stake. (SOF ¶¶ 28-30, 33-34, 36.)

In fact, Tambi testified that he is not even sure if Shah ever *orally* acknowledged that Bio-Pharm did not have an equity stake:

> Q.   I am asking whether you recall whether Amit
>      ever said in his own words that he
>      understood that Bio-Pharm did not have an
>      equity ownership position in Escitalopram?
>
> **A.   My understanding to that: He may have.**
>
> Q.   He may have, but you don't remember if he
>      did or not?
>
> [Objection]
>
> **A.   Not definitively.**

(SOF ¶ 42.)

Thus, it is no surprise that Antrim admitted that there was a disagreement over the terms when the Parties tried to draft a written agreement:

> Q.   Yes, there [was] disagreement over some of
>      the terms when Antrim and Bio-Pharm tried to
>      reduce an agreement to writing?
>
> **A.   Yes.**

(SOF ¶ 20.) Or as Shah wrote to Tambi on July 27, 2015 after realizing that the Parties were operating under different understandings, "[t]here is some misunderstanding here and this is not just a profit sharing agreement. We are expecting that we own 25% of the Product." (*See* Exhibit 4 to SOF.)

Finally, Tambi admitted that he does not know what was in Shah's mind – and effectively admitted that there was an honest misunderstanding between the Parties:

> Q.   Will you at least agree with me that it is
>      possible that you and Amit and an honest
>      misunderstanding. . .
>
> [Objection]
>
> Q.   About the difference in the meaning of
>      profit split versus equity?
>
> [Objection]
>
> A.   **I really cannot say what was in his mind.** I
>      know what he was driving at in this last
>      year or so…

(SOF ¶ 43.)

And further:

> Q.   You don't think it is possible that you and
>      Amit just had a misunderstanding?
>
> [Objection]
>
> A.   **Sir, I don't know what the understanding**
>      **was.** It looks like he's, you know, kind of
>      obsessed with this joint venture, which
>      lapsed.

(SOF ¶ 44.)

Again, Antrim and Tambi's subjective beliefs are irrelevant. *See Dillard*, 483 F.3d at 507. A meeting of the minds is measured objectively. *Id.* And objectively, Bio-Pharm never accepted or reached a meeting of the minds to give up its equity. Both are required to form a valid oral

contract in Illinois – and Antrim has neither. As a result, Antrim's alleged oral contract is unenforceable under Illinois law, and Bio-Pharm is entitled to summary judgment on Count I.

**B.** **Antrim Did Not Agree to Pay Bio-Pharm's Price of $6.78 to Manufacture Escitalopram.**

Antrim's alleged oral agreement is also insufficiently definitive on an essential term – price – to be enforceable.

"For an oral contract to be valid and enforceable, its terms must be definite and consistent." *Downs v. Rosenthal Collins Grp., LLC*, 2011 IL App (1st) 090970, ¶ 49. *See also PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728 (7th Cir. 2005) (reversing jury verdict and directing summary judgment). "Just because the parties have reached a consensus on particular terms, or indicated a desire to work together in the future, does not mean that a contract has been formed." *Tindall Corp. v. Mondelex Int'l, Inc.*, 2017 WL 1163879, at *8 (N.D. Ill. Mar. 29, 2017) (finding no oral or written contract where significant terms were open).

Tambi admits that he cannot identify all of the terms in Antrim's alleged oral agreement. (SOF ¶ 45.) More importantly, Antrim and Bio-Pharm never agreed on price. Tambi claims that Antrim agreed to pay Bio-Pharm the cost of manufacturing the Products plus 10%. (SOF ¶ 46.) But the devil is always in the details. In an email to Brian Tambi on October 28, 2015, Amit Shah informed Tambi that based on the batch size of Antrim's order, it would cost Bio-Pharm $6.78 per bottle to manufacture Escitalopram.[4] (SOF ¶ 47.) Antrim never agreed to pay that amount. (SOF ¶ 48.)

As noted by Judge Easterbrook in *PFT Roberson*, "parties may reach agreement on elements A, B and C, with more negotiation required on D and E. If elements D and E are

---

[4] The Parties interchangeably referred to Bio-Pharm's manufacturing price as "cost of goods sold," "COGS," and/or the "transfer price."

essential to the mix, Illinois does not bind the parties to A, B, or C alone." *PFT Roberson,* 420 F.3d at 731. "Should agreement on essential elements fail, it is a failure of negotiation not performance." *Id.*

That is what happened here. In addition to never agreeing on Bio-Pharm's equity, Antrim never agreed to pay Bio-Pharm's manufacturing price of $6.78 per bottle of Escitalopram.

**C.    Bio-Pharm's Alleged Breach Did Not Cause Any Damages.**

Bio-Pharm is also entitled to summary judgment on Count I because Antrim cannot prove that it suffered any damages as a result of Bio-Pharm's alleged breach.

A party seeking damages for breach of contract "must show causation, that is that the alleged breach is the cause of those damages, with reasonable certainty." *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 633 (7th Cir. 2007). *See also Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 832 (Ill. 2005) ("the claimant must establish an actual loss or measureable damages resulting from the breach in order to recover.").

Here, Bio-Pharm was (and still is) legally unable to sell either Product. So even if Bio-Pharm breached the alleged agreement, it did not cause Antrim any damages.

**1.    Antrim does not have regulatory approval to sell Ondansetron.**

It is undisputed that without an approved ANDA from the FDA, Antrim cannot sell Ondansetron. (SOF ¶ 49.) It is also undisputed that Antrim does not have an approved ANDA for Ondansetron – and never did. (SOF ¶ 50.) Accordingly, Bio-Pharm's alleged breach is not the cause of Antrim's inability to sell Ondansetron. Antrim can recover no such damages.

**2.    Antrim is not legally able to sell Escitalopram either.**

An FDA-approved ANDA is merely a necessary condition for Antrim to legally sell Escitalopram. But it is not sufficient. Antrim must also have a license to sell the Products, or alternatively, contract with a third-party that does. Antrim has neither.

11

At the time of Bio-Pharm's alleged breach, Antrim did not have a license to sell the Products directly (and still doesn't). (SOF ¶ 51.) Without its own license to sell Escitalopram directly, Antrim must contract with a third-party with the necessary licenses to sell it on Antrim's behalf. (SOF ¶ 52.) It never did.

Originally, Antrim claimed that it had an agreement with third-party Leading Pharma whereby "Leading was responsible for obtaining the necessary license(s) to sell the Products on behalf of Antrim." (SOF ¶ 53.) But Antrim *did not*, in fact, have any such agreement with Leading. Leading's Executive Vice President, Brian Shapiro, was the "point person" for negotiating a distribution agreement with Antrim. (SOF ¶ 54.) Shapiro testified that Antrim and Leading "never had an executed agreement" and that "[n]egotiations were ongoing and then we stopped." (SOF ¶¶ 55-56.) For example, the last draft exchanged between them had "some changes that were discussed that are still redlined, therefore not everything was resolved" and was "not an accepted agreement." (SOF ¶ 57.) As Leading's Rule 30(b)(6) witness, Shapiro explained further: "You know you can't ship without an audit, you can't ship without a purchase order, so none of those things ever took place because we never got to the execution point of the agreement." (SOF ¶ 58.) In his Rule 30(b)(6) capacity, Shapiro also confirmed that Antrim and Leading did not agree on (i) the transfer price, and (ii) the batch size. (SOF ¶ 59.)

After the Shapiro and Leading depositions, Bio-Pharm issued a request for admission asking Antrim to "[a]dmit that Antrim has not executed a sales agreement with anyone to replace Leading Pharma." (SOF ¶ 60.) Presumably realizing that it was in trouble on that front, Antrim answered by asserting that it had now signed a "preliminary agreement" with a new distributor, RxTPL, to "market, license, and sell Escitalopram and Ondansetron in place of Leading Pharma." (*Id.*) But then Bio-Pharm deposed RxTPL, who flatly contradicted Antrim's assertion:

> Q.　There's nothing in this agreement that would suggest that RxTPL is going to sell and market Antrim's products; is that fair?
>
> **A.　Correct.**
>
> Q.　And RxTPL, at least right now, has no future intention of selling and marketing Antrim's products, correct?
>
> **A.　Correct.**

(SOF ¶ 61.)

So Bio-Pharm's alleged breach is not the cause of Antrim's inability to sell the Products. It is undisputed that at the time of Bio-Pharm's alleged breach, Antrim could not sell the Products itself. And Antrim failed to contract with a third-party that could.

### D.　Antrim's Alleged Damages Are Barred by the New Business Rule.

Under Illinois law, a start-up company cannot recover lost profits or valuation damages because they are inherently speculative. Here, Antrim is seeking those damages despite being just such a company. (SOF ¶ 67.) Accordingly, Bio-Pharm is also entitled to summary judgment on Count I because Antrim's alleged damages are precluded as a matter of law.

"The general rule under Illinois law is that a new business has no right to recover lost profits." *TAS Distrib.*, 491 F.3d at 634. "This maxim is commonly referred to as the 'new business rule.'" *Id.* at 633. "Under Illinois law, a new business, or an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of certainty." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 908 (N.D. Ill. 2001). *See also Clutch Auto Ltd. v. Navistar, Inc.*, 2015 WL 1299281, at *8 (N.D. Ill. Mar. 19, 2015) ("Without an appropriate track record of selling clutches in the United States under its own name or other "special evidence". . .Plaintiff cannot avoid summary judgment or escape application of the new business rule.").

13

In this case, it is undisputed that Antrim is a start-up company with no track record that can form the basis of a lost profits claim under Illinois law. Antrim admits that it is a "virtual" company. (SOF ¶ 62.) It has no employees. (SOF ¶ 63.) It has never had any annual revenues. (SOF ¶ 64.) It has never brought a single product to market. (SOF ¶ 65.) And other than Escitalopram, Antrim has never received regulatory approval to sell another product. (SOF ¶ 66.)

In other words, Antrim is exactly the type of start-up company for which the new business rule exists. As a matter of law, its damages claims for lost profits and enterprise valuation (which is based on Antrim's alleged lost profits) are inherently speculative and unrecoverable. *Kinesoft,* 139 F. Supp. 2d at 908. This is yet another reason that Bio-Pharm is entitled to summary judgment on Count I.

## II.   IN THE ALTERNATIVE, BIO-PHARM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS FIRST AFFIRMATIVE DEFENSE OF MITIGATION.

Following Bio-Pharm's alleged breach, Antrim needed to obtain a "site change" from the FDA replacing Bio-Pharm with a new manufacturer of record. Antrim and Bio-Pharm both agree that a "site change" should take no more than one year. But two years later, Antrim has failed to even apply for one. So at the very most, Antrim's failure to mitigate its damages by seeking a site change bars Antrim from recovering anything more than one year off Escitalopram sales.

"[T]he law imposes upon a party, injured from another's breach of contract or tort, the active duty of making reasonable exertions to render the injury as light as possible." *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill. App. 3d 254, 258 (2d Dist. 1982). "If, by this negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him." *Id.*

Here, Antrim has failed to mitigate its damages by applying for a "site change" with the FDA. At the Rule 30(b)(6) deposition of Antrim, Tambi admitted that it should only take "about

a month" to find a new manufacturer to replace Bio-Pharm. (SOF ¶ 68.) *At most*, it should not take Antrim more than two months to find a new manufacturer of Escitalopram. (SOF ¶ 69.) Antrim has also admitted that the FDA application that is submitted can be a CBE-30 application, which requires the FDA to accept or reject the application within 30 days after filing. (SOF ¶ 70.) In other words, Antrim would be able to start selling Escitalopram within 30 days of filing its 'site change' application. All told, Antrim admits that the site change process tales "roughly one year." (SOF ¶ 71. *See also* SOF ¶ 72.) Once a site change is approved, Antrim can begin making and selling Escitalopram. (SOF ¶ 73.)

As of November 2016 – approximately one year after Bio-Pharm's alleged breach – Antrim had failed to find a new manufacturer despite admitting that it would only take "about a month" to do so. (SOF ¶ 74.) Nor had Antrim filed for a site change as of that date.  (*Id.*) Or started manufacturing Escitalopram. (SOF ¶ 75.)

Two years after Bio-Pharm's alleged breach, Antrim has not even applied for a site change. (SOF ¶ 76.) But if it had timely done so after Bio-Pharm's alleged breach in 2015, Antrim would have been selling Escitalopram within a year. (SOF ¶¶ 71-72.) As a result, Antrim has failed to mitigate its damages by failing to take the reasonable step of applying for a 'site change.' At most, Antrim should have only suffered one year of lost Escitalopram sales as a result of Bio-Pharm's alleged breach. Bio-Pharm is therefore entitled to summary judgment that Antrim is entitled to nothing more.

### III. BIO-PHARM IS ENTITLED TO SUMMARY JUDGMENT ON ANTRIM'S UNJUST ENRICHMENT CLAIM (COUNT III) BECAUSE THERE IS NO EVIDENCE THAT BIO-PHARM WAS UNJUSTLY ENRICHED.

Bio-Pharm is also entitled to summary judgment on Antrim's claim for unjust enrichment (Count III) because Antrim has no proof that Bio-Pharm has been enriched.

Unjust enrichment "'does not seek to compensate a plaintiff for loss or damages suffered but seeks to disgorge a benefit that the defendant unjustly retains.'" *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (quoting *Cleary v. Philip Morris, Inc.,* 656 F.3d 511, 518 (7th Cir.2011)). "'[T]he essence of the cause of action is that one party is enriched, and it would be unjust for that party to retain the enrichment.'" *Firemen's Annuity & Ben. Fund v. Mun. Empl.'s, Officers' & Officials' Annuity & Ben. Fund of Chicago,* 579 N.E.2d 1003, 1007 (Ill. App. 1991).

Here, Bio-Pharm has not sold, used, or benefitted from its retention of the Products in any way. (SOF ¶ 77). Antrim has no evidence that Bio-Pharm has. (SOF ¶ 78.) Since Antrim has no evidence of an element of its claim, Bio-Pharm is entitled to summary judgment on Count III. *See Renteria,* 2003 WL 21995190, at * 8.

## IV. ANTRIM'S MOTION FOR SUMMARY JUDGMENT ON BIO-PHARM'S COUNTERCLAIMS SHOULD BE DENIED.

Antrim also seeks summary judgment on Bio-Pharm's counterclaims for (i) promissory estoppel, or in the alternative, and (ii) breach of contract. Antrim's motion should be denied.

### A. Bio-Pharm's Promissory Estoppel Counterclaim Seeks $277,000 in Detrimental Reliance.

Antrim claims that 'there is no evidence in the record' regarding the amount of Bio-Pharm's damages under its promissory estoppel theory. (Antrim's Mem. at 5.) But as explained below, Bio-Pharm is seeking – and can prove – that it incurred $277,000 in damages as the result of its detrimental reliance on Antrim's promises to honor the 2009 Term Sheet.

Promissory estoppel is a quasi-contractual claim that presupposes the absence of an express contract. *See, e.g., Prodromos v. Poulos*, 560 N.E.2d 942, 948 (Ill. App. 1990). "The elements required for a promissory estoppel claim under Illinois law are (1) defendants made an unambiguous promise to plaintiff; (2) plaintiff relied on this promise; (3) plaintiff's reliance was

expected and foreseeable by defendants; and (4) plaintiff relied to his detriment." *Argonaut Ins. Co. v. Broadspire Servcs., Inc.,* 2008 WL 4346418, at *4 (N.D. Ill. Mar. 25, 2008). "The underlying purpose of the doctrine of promissory estoppel is to protect innocent parties." *Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co.*, 637 N.E.2d 1103, 1108 (Ill. App. 1994).

For starters, Antrim appears to misapprehend Bio-Pharm's promissory estoppel claim as based directly on the 2009 Term sheet, which Antrim correctly notes "has lapsed." (Antrim's Mem. at 4.) Antrim overlooks Bio-Pharm's allegation that *even after the Term Sheet lapsed*, Antrim repeatedly promised to honor the framework of the Term Sheet by providing Bio-Pharm with equity and reimbursement of costs. Paragraph 11 of Bio-Pharm's counterclaim states in full:

> **Although the Term Sheet expired by its terms** if the parties did not sign and execute a definitive agreement, and Antrim purported to repudiate it at least with respect to Zhaveri, **Antrim repeatedly assured Bio-Pharm that it would honor its promises** to reimburse Bio-Pharm's out-of-pocket costs for manufacturing and development, and to provide Bio-Pharm with an equity ownership in the Products as well.

(*See* Countercl. [ECF #26] at ¶ 11.)

So what are Bio-Pharm's damages? Here, Antrim appears to misunderstand Bio-Pharm's promissory estoppel claim again. Antrim claims that "Bio-Pharm has the burden of proving it has suffered damages from not obtaining an alleged equity interest in the Products." (Antrim's Mem. at 5.) But Bio-Pharm is not seeking damages "for not obtaining the alleged equity interest." Rather, Bio-Pharm incurred $277,000 in manufacturing costs by relying on Antrim's promises: (1) $152,000 for Escitalopram; and (2) $125,000 for Ondansetron. (*See* Bio-Pharm's Statement of Additional Facts in Opp. to Antrim's Mot. for Summary J. (hereinafter, "SOAF") at ¶ 1.) As Amit Shah testified in his deposition, Bio-Pharm incurred those costs "in developing and manufacturing the products at issue in reliance on Mr. Tambi's representations that the term

17

sheet would serve as the framework for the relationship between Antrim and Bio-Pharm". (SOAF ¶ 2.) That is the amount Bio-Pharm is seeking in damages under promissory estoppel.

Accordingly, Bio-Pharm has sufficient documentary and testimonial evidence to support its claim for damages under its promissory estoppel counterclaim. Antrim's motion for summary judgment should therefore be denied.

### B. The Doctrine of Anticipatory Repudiation Precludes Antrim's Motion for Summary Judgment on Bio-Pharm's Breach of Contract Counterclaim.

Antrim also seeks summary judgment on Bio-Pharm's second counterclaim for breach of contract, which is alleged in the alternative to Bio-Pharm's promissory estoppel counterclaim. Antrim asserts that there is no causation, arguing that Bio-Pharm is responsible for its own damages because it failed to turn over the Products to Antrim for commercialization, from which Antrim had agreed to reimburse Bio-Pharm's costs. (Antrim's Mem. at 9.) Antrim's argument fails, however, because it disregards the doctrine of anticipatory repudiation.

"An anticipatory breach, also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance." *Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 940 (Ill. App. 2007). An anticipatory repudiation gives the non-breaching party three options:

> "(1) to rescind the contract altogether and pursue the remedies based on the rescission; (2) to elect to treat the repudiation as an immediate breach by bringing suit or by making some change in position; or (3) to await the time for performance of the contract and bring suit after that time has arrived.

*Id.* (citing 23 R. Lord, Williston on Contracts § 63:33, at 561 (4th ed.2002)). "Put another way, when one party repudiates a contract, the nonrepudiating party is excused from performing or may continue to perform and seek damages for the breach." *Id.* (internal citations omitted). As noted by the Seventh Circuit, "the doctrine of anticipatory repudiation does not traffic in the

18

miraculous. A breach occurs when it is reasonably certain that the other party is not going to meet its obligations under the contract in timely fashion." *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 919 (7th Cir. 2001) "At that point the potential victim is freed from its own contractual obligations and authorized to take all reasonable self-protective measures, including suing." *Id.*

As set forth above in support of Bio-Pharm's own motion for summary judgment, it remains Bio-Pharm's principal position that a binding oral agreement between Antrim and Bio-Pharm was never formed. (*See* pages 4-11, *supra*.) But in the alternative, Bio-Pharm contends that *if* an oral agreement was formed between the Parties, it was based on their mutual assent to continue operating under the 2009 Term Sheet. And there is ample evidence of that. (SOF ¶¶ 25-29.) If a jury determines that Antrim *did* bind itself to honor the 2009 Term Sheet even after its formal lapse, then Bio-Pharm has a claim for breach of contract. It is undisputed that after the ANDA for Escitalopram was approved in May 2015, Antrim refused – or 'anticipatorily repudiated' – Antrim's promise to give Bio-Pharm equity in the Products. (SOAF ¶ 3.) Under the doctrine of anticipatory repudiation, Bio-Pharm was then freed from its own performance and entitled to sue Antrim for breach of contract. *See Tower Inv'rs,* 864 N.E.2d at 940; *Cent. States,* 252 F.3d at 919. In other words, Bio-Pharm was under no obligation to deliver the Products.

## CONCLUSION

For the foregoing reasons, Bio-Pharm respectfully requests summary judgment on Counts I (breach of oral contract) and III (unjust enrichment) of Antrim's Complaint. In the alternative, Bio-Pharm respectfully requests partial summary judgment on its First Affirmative Defense as a result of Antrim's failure to mitigate all but one year of Escitalopram sales.

Additionally, Bio-Pharm respectfully requests that Antrim's motion for summary judgment on Bio-Pharm's counterclaims be denied and the case set for trial thereon.

Date:   December 1, 2017

Respectfully submitted,

  /s/ John C. Gekas
Saul Ewing Arnstein & Lehr LLP
161 N. Clark Street, Suite #4200
Chicago, Illinois 60601
Tel: (312) 876-7124
john.gekas@saul.com

*Attorney for Bio-Pharm, Inc.*

**CERTIFICATE OF SERVICE**

I, John C. Gekas, an attorney, hereby certify that I caused the foregoing document to be filed with the Court's CM/ECF system and thereby served on all counsel of record registered to receive such service.

    /s/ John C. Gekas