IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTRIM PHARMACEUTICALS LLC, an Illinois limited liability company | ) ) ) | Case No. 16-cv-00784 |
| Plaintiff, | ) ) | Hon. Matthew F. Kennelly |
| v. | ) ) ) | |
| BIO-PHARM, INC., a Pennsylvania corporation | ) ) ) ) | |
| Defendant. | ) | |

**ANTRIM PHARMACEUTICALS LLC'S COMBINED MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO BIO-PHARM'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SUMMARY JUDGMENT**

W. Gordon Dobie
Jennifer A. Miller
Thomas G. Weber
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

*Attorneys for Antrim Pharmaceuticals LLC*

## INTRODUCTION

Bio-Pharm worked for years to hold up its end of the bargain in its agreement with Antrim. It agreed to develop, manufacture, and supply generic pharmaceutical products for commercialization. Bio-Pharm agreed to list itself as the *contract manufacturer* in the applications for federal approval of the products. It was only after the parties obtained FDA approval for Escitalopram, and on the eve of launch, that Bio-Pharm changed its tune and demanded new, better terms (i.e., an ownership interest instead of profit-sharing). Bio-Pharm admittedly sought to "break" Antrim like a "cookie," and it was ultimately successful, as Bio-Pharm refused to ship the product and blocked Antrim from launching its products and growing its business. This case is about holding Bio-Pharm responsible for its breach of the parties' agreement. Each of the grounds set forth by Bio-Pharm for why it is entitled to summary judgment on Antrim's breach of contract claim is without merit. Bio-Pharm's motion for summary judgment should be denied for the reasons below.

Bio-Pharm also argues that its counterclaims for promissory estoppel and breach of contract should survive summary judgment because Bio-Pharm was "freed" from having to ship the products based on the doctrine of anticipatory repudiation. But since Bio-Pharm cannot make a showing that it anticipatorily repudiated the parties' agreement, Bio-Pharm cannot show that it did not bring about its own damages, and summary judgment should be granted to Antrim on Bio-Pharm's counterclaims.

## FACTUAL BACKGROUND[1]

Antrim is an Illinois company that manufactures generic drugs.[2] (SOF ¶ 1.)[3] Bio-Pharm is a contract manufacturer of generic pharmaceutical products. (SOF ¶ 5.) Before this lawsuit,

---

[1] This section includes a high-level summary of the factual background of this case. Specific facts relevant to issues raised in Bio-Pharm's motion for summary judgment are addressed in the respective Argument section below.

the parties worked together for six years to manufacture two generic products, Escitalopram and Ondansetron (the "Products"), with the goal of obtaining FDA approval and commercializing the Products. (SOF ¶ 8.) When the parties first began working together in 2009, they agreed to enter into a Term Sheet. The Term Sheet provided for the creation of a joint venture whereby a separate corporate entity would be created and each member of the joint venture would have an ownership interest. (RSOF ¶¶ 9, 13; ASOF ¶ 5.) By its own terms, the Term Sheet lapsed when a definitive agreement was never reached. (RSOF ¶¶ 9, 10, 16; ASOF ¶ 4.) The parties continued to work together to produce the Products with the understanding that there would be no joint venture and no split ownership. Instead, they agreed that Antrim would file an ANDA application, listing Bio-Pharm as the contract manufacturer, and obtain approval for the products; Bio-Pharm would manufacture the products for marketing and sale; and upon commercialization, Antrim would reimburse Bio-Pharm its costs plus ten percent and pay Bio-Pharm 25% *net profits* (not ownership) from commercial sale. (RSOF ¶¶ 18, 28-35.)

The parties worked for years under this mutual understanding. Bio-Pharm manufactured regulatory batches of Escitalopram for Antrim. (SOF ¶ 9.) Antrim filed an ANDA application for the Products in its name, listed Bio-Pharm as the contract manufacturer,[4] and Antrim obtained approval from the FDA for Escitalopram. (SOF ¶¶ 10-11.) Upon approval, Bio-Pharm produced Escitalopram for Antrim to market and sell to the public. (SOF ¶ 17.) The parties agreed that a third party, Leading, would market and sell the products. (SOF ¶ 18.) Leading prepared purchase orders for Escitalopram and was "ready to launch." (SOF ¶¶ 21-22.). After

---

[2] It is undisputed that Antrim holds the ANDAs in this case. (SOF ¶¶ 10-12.) The "applicant" on the ANDA applications is "Brian T. Laboratories LLC." Antrim was formerly known as Brian T. Labs. (SOF ¶ 2.)
[3] Citations to the Statement of Facts filed in support of Antrim's motion for summary judgment refer to "SOF." Citations to Antrim's Response to Bio-Pharm's Statement of Facts filed in support of Bio-Pharm's motion for summary judgment are referred to "RSOF." Citations to Antrim's Statement of Additional Facts in Opposition to Bio-Pharm's motion for summary judgment are referred to as "ASOF."
[4] The FDA has not approved the ANDA application for Ondansetron for reasons relating to the API manufacturer. (SOF ¶ 13.)

roughly *six years* of working together, and as launch of Escitalopram was imminent, Bio-Pharm refused to ship the product, using its possession of the product as leverage to force Mr. Tambi (Antrim's founder) to award Bio-Pharm an ownership interest in the products, presumably because Bio-Pharm's prior efforts were unsuccessful.[5] (RSOF ¶¶ 58-59; ASOF ¶ 16.)

**LEGAL STANDARD**

Summary judgment should be denied "[i]f a reasonable jury could return a verdict for the non-moving party." *Leibowitz v. Bowman Int'l, Inc.*, No. 15 C 3021, 2016 WL 6804580, at *2 (N.D. Ill. Nov. 17, 2016) (Kennelly, J.) (citing *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014)). "In determining whether a genuine issue of material fact exists, [the Court] view[s] the record in the light most favorable to the nonmoving party," which here is Antrim. *Bunn*, 753 F.3d at 682 (citation omitted). "'In the light most favorable' simply means that summary judgment is not appropriate if the Court must make a 'choice of inferences.'" *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997) (citations omitted). The jury, not the Court, is responsible for choosing between reasonable inferences from fact. *Id.* (citation omitted).

**ARGUMENT**

**I.  BIO-PHARM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANTRIM'S BREACH OF CONTRACT CLAIM (COUNT I).**

Antrim's founder, Mr. Tambi, testified that he never once agreed to extend to Bio-Pharm an ownership stake in the Products, but rather only a portion of the net profits. The parties' course of conduct, as explained below, corroborates that. Bio-Pharm, on the other hand, claims there was no such profit-sharing agreement and instead it was entitled to ownership in the Products. That is a classic factual dispute that precludes summary judgment.

---

[5] While it is true that Mr. Shah asked about Bio-Pharm receiving a potential ownership stake in the Products prior to the FDA's approval of Escitalopram, Mr. Tambi never agreed to change the terms and give Bio-Pharm ownership. (RSOF ¶¶ 28-30; ASOF ¶¶ 29-30.)

### A. Mr. Tambi Testified Clearly About the Existence and Terms of the Profit-Sharing Agreement with Bio-Pharm

A leading theme in Bio-Pharm's Motion is that Mr. Tambi did not clearly testify about the profit-sharing agreement reached between the parties. In order to make its argument, Bio-Pharm either (i) omits Mr. Tambi's testimony directly on this topic, or (ii) selectively quotes excerpts while omitting surrounding testimony that provides context. Neither tactic is persuasive.

For example, Bio-Pharm argues that Mr. Tambi was "unable to testify to a coherent and consistent articulation of the alleged agreement." (Bio-Pharm Mot. at 6.) This is a disingenuous reading of the record. Mr. Tambi testified that the material terms of the parties' agreement were that Bio-Pharm: (1) would manufacture the Products and have its expenses reimbursed from net profit, (2) would receive 25% of net profit sales from the Products, (3) would supply the Products and be reimbursed cost plus ten percent, and (4) Antrim would market the products. (RSOF ¶ 45; ASOF ¶ 11.) Mr. Tambi testified that he conveyed these terms to Bio-Pharm "every day," "hundreds of times," and Bio-Pharm "understood very well, in no uncertain terms, that this was the business relationship. This was the paybacks. These are the rewards. And – And we were continuing."[6] (RSOF ¶ 17; *see also* ASOF ¶ 3.) Bio-Pharm can argue that the terms of the agreement were the contrary to a jury. But not to this Court at summary judgment.

### B. In any Event, the Parties' Course of Conduct for Years Shows a Meeting of the Minds That Bio-Pharm Was Only Entitled to Profit-Sharing

Antrim and Bio-Pharm worked together for six years to obtain approval for, manufacture, and launch the Products. It defies common sense that Bio-Pharm would expend all of this time and effort if there was no meeting of the minds on the key terms of the parties' agreement. Of course, there was an agreement, and here there is evidence supporting every element of the parties' agreement. *See, e.g.*, *Koursa, Inc. v. Manroland, Inc.*, 971 F. Supp. 2d 765, 788 (N.D. Ill.

---
[6] Bio-Pharm's claim that Mr. Shah never agreed to profit-sharing in writing is irrelevant.

2013) (denying summary judgment where each party had submitted evidence supporting its interpretation of events). Antrim's Complaint alleges, and the record shows, the following components of the parties' agreement:

- Antrim alleges that the parties agreed that Bio-Pharm would manufacture Escitalopram exclusively for Antrim. (Compl. ¶ 17(a)). The record shows that Bio-Pharm manufactured Escitalopram for Antrim and pursuant to Antrim's ANDA, which listed Bio-Pharm as a contract manufacturer. (ASOF ¶ 3, 21.)

- Antrim alleges that Bio-Pharm prepared regulatory batches of Escitalopram and information relating thereto for Antrim's FDA filing. (Compl. ¶ 17(b)). Bio-Pharm testified that Bio-Pharm manufactured regulatory batches of Escitalopram for Antrim. (SOF ¶ 9.)

- Antrim alleges that immediately following FDA approval, Bio-Pharm was to manufacture and ship Escitalopram consistent with Antrim's ANDA filing. (Compl. ¶ 17(c)). The record shows that following FDA approval, Bio-Pharm was instructed to and did manufacture Escitalopram for shipment. (ASOF ¶ 21.)

- Antrim alleges that Bio-Pharm was supposed to provide Antrim with 3,300 bottles of Escitalopram for immediate sale following FDA approval. (Compl. ¶ 17(d)). The evidence shows that Bio-Pharm prepared approximately the same number of bottles of Escitalopram and informed Antrim that they were near ready for shipment. (ASOF ¶ 22.)

- Antrim alleges that following approval and marketing, Antrim would reimburse Bio-Pharm for out-of-pocket costs for its FDA work and FDA batches of Escitalopram. (Compl. ¶ 17(e)). Antrim agreed to pay Bio-Pharm its out-of-pocket costs for the FDA work, despite the fact that they were outrageously high. (ASOF ¶ 23.)

- Antrim alleges that following approval and marketing, Antrim was supposed to reimburse Bio-Pharm all actual costs of manufacturing the Escitalopram batches for sale. (Compl. ¶ 17(f)). Bio-Pharm testified Antrim agreed to reimburse Bio-Pharm the actual costs of manufacturing Escitalopram for batches of sale. (ASOF ¶ 24.)

- Antrim alleges that Bio-Pharm would receive 20% of Net Profits for the "life of the product." (Compl. ¶ 17(g)). Bio-Pharm testified that prior to FDA approval, it was Bio-Pharm's understanding that Bio-Pharm would receive 25% net profit from a net profit split after Brian Tambi and Amit Shah agreed to increase the amount from 20% to 25%. (ASOF ¶ 25.)

Antrim further alleges that, notwithstanding the agreement between the parties and without due cause, Bio-Pharm "has withheld shipment of [Escitalopram] in an apparent attempt to coerce Antrim into providing payments in excess of the agreed to amounts." (Compl. ¶ 19.) This is true, and Bio-Pharm testified that it has withheld shipment of Escitalopram. (SOF ¶ 19.)

Moreover, while Bio-Pharm makes much of the fact that there is no alleged written agreement, Illinois law makes clear that a perfectly enforceable agreement can be inferred from the conduct or course of dealings of the parties. *In Re Estate of Brumshagen*, 169 N.E.2d 112, 116 (Ill. App. Ct. 1960); *Dallis v. Don Cunningham and Associates*, 11 F.3d 713, 716 (7th Cir. 1993). This is true regardless of the subjective belief of the parties. *See In re Marriage of Kloster*, 469 N.E.2d 381, 383 (Ill. App. Ct. 1984); *see also Caporale v. Mar Les, Inc.*, 656 F.2d 242, 244 (7th Cir. 1981).

Here, communications reflect that Mr. Tambi made clear to Mr. Shah several times that the parties had agreed to a 20% net profit split, and after each time, the parties continued to work together. It was only after the FDA approved the ANDA for Escitalopram, and on the eve of launch, that Bio-Pharm sought to "break" and "threaten" Antrim into changing the terms. (ASOF ¶¶ 36, 38.) For example, in March 2012, Mr. Tambi informed Mr. Shah that the parties agreed to a net profit split, and they continued to work together. (ASOF ¶ 26.) Mr. Shah "showed . . . interest" in 2012 in receiving "some type of equity investment," but Mr. Tambi declined the offer to change the terms, and the parties continued to work together. (ASOF ¶ 27.) In early 2013, Mr. Shah wrote Mr. Tambi and said that Bio-Pharm would like to have costs accounted for prior to commercialization and would like to have a larger share in the product, but Mr. Tambi once again declined to change the terms, and the parties continued to work together. (ASOF ¶ 29-30.) In fact, after these communications, Bio-Pharm approved the product label for Escitalopram, manufactured commercial batches for launch, held an audit of its facility on the eve of launch, and helped Antrim arrange for Leading to market and distribute. (ASOF ¶ 21-22, 32-33; RSOF ¶ 58.)

### C. All of This Aside, the Purported Evidence Bio-Pharm Cites to Support its Own Version of Events Is Misleading and Illustrates Why Summary Judgment Must Be Denied

That Bio-Pharm can cite evidence that allegedly supports its version of events does not mean that it is entitled to summary judgment.[7] For example, Bio-Pharm repeatedly points to the Term Sheet as governing the parties' conduct. But it is undisputed that the Term Sheet lapsed, and no steps were taken to form a joint venture or allocate ownership among the members. (RSOF ¶ 3; Bio-Pharm Motion at 17.) Mr. Tambi also testified that after the Term Sheet lapsed the new agreement between the parties was *not* based on the term sheet: "It was understood . . . . that there was no equitable position in any company because there's no company–new company. But there's no such thing as an equity, but there would be a sharing of the profits." (RSOF ¶¶ 25, 38, 39.) Again, this is evidence for the jury to weigh and consider.

Bio-Pharm also relies on several draft agreements that allegedly contained references to ownership. (Bio-Pharm Mot. at 6.) Bio-Pharm, though, fails to explain to the Court the clear drafting history of those documents. The "draft" agreement sent by Mr. Shah in November 2010 was dated February 2010, and Mr. Shah acknowledged that it was a "template agreement" and there would need to be a lot of changes. (RSOF ¶ 34.) And in response to the June 9 and July 7, 2015 drafts from Mr. Shah, ***Mr. Tambi deleted the provisions giving Bio-Pharm a 25% ownership in the products***. (RSOF ¶ 32.) In any event, a jury would afford little weight to Bio-Pharm's self-serving drafts because the FDA had already approved the ANDA for Escitalopram and Bio-Pharm was using the approval as leverage to demand better terms than agreed to.

---

[7] Bio-Pharm obtained a page-limit extension from the Court so that it could spend six pages of its brief pasting cherry-picked excerpts of Brian Tambi's deposition and emails from a time span of several years to argue that there was no agreement. For efficiency, Antrim will not respond to every piece of evidence set forth by Bio-Pharm in its opposition brief. Generally, Antrim contends that the evidence cited by Bio-Pharm is often taken out of context and misleading, as set forth and clarified in Antrim's responses to Bio-Pharm's 56.1 statement.

This is consistent with the theme that Antrim will present at trial that after the FDA approved the ANDA and on the eve of launch, Mr. Shah demanded that Antrim reimburse Bio-Pharm its costs prior to commercialization. (ASOF ¶ 36.) In response, Mr. Shah's father, the owner of Bio-Pharm, instructed Mr. Shah that Mr. Tambi was a "***tough cookie to break***," and cheered "you will do it." (ASOF ¶ 36.) Nearly one month later, Mr. Shah admitted to his mother that he "**want[ed] to threaten**" Mr. Tambi into striking a better deal. (ASOF ¶ 38.) In short, a jury could find that Bio-Pharm's cited evidence is unpersuasive and self-serving when viewed in the proper context. Summary judgment is simply inappropriate here for all of these reasons.

### D. The Parties Agreed That Bio-Pharm Would be Reimbursed Cost Plus Ten Percent, Even Though Bio-Pharm Increased the Cost Out of Bad Faith

Bio-Pharm argues—incorrectly—that Antrim never agreed to pay Bio-Pharm's price of $6.78 to manufacture Escitalopram, and therefore there was no agreement on a key term. (Bio-Pharm Mot. at 10.) Bio-Pharm is wrong. Cost plus ten percent was a material term agreed to by both parties. Both parties testified that Antrim agreed to pay Bio-Pharm the cost of goods sold plus ten percent. (RSOF ¶¶ 47-48; ASOF ¶¶ 11, 24.) Although the parties agreed on this material term, Antrim nevertheless investigated why Mr. Shah increased the price from $2.00 to $6.78 per bottle in a five-month period without informing anyone, causing Antrim's licensor to comment at the time that he needed to be "smack[ed]" for failing to be "completely transparent." (RSOF ¶ 47.) In any event, that both parties agreed to cost plus ten percent as a material term of the agreement is not in dispute.

Bio-Pharm also seeks to improperly introduce a false fact into evidence by attaching Mr. Shah's affidavit to its brief. (Bio-Pharm Motion at 10, citing Ex. 6, Decl. of Amit Shah ¶ 18.) Mr. Shah testified at his deposition that Antrim agreed to reimburse Bio-Pharm cost plus ten percent. Now, in an about face, Mr. Shah submits an affidavit that testifies to the exact opposite. It

is well accepted that a party cannot file an affidavit to create an undisputed fact. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) (following "the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."); *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995). In short, Bio-Pharm cannot undo Mr. Shah's testimony on summary judgment.

### E. Antrim's Damages Are Well-Supported

Bio-Pharm next attempts to take issue with the damages calculations of Antrim's retained expert, Sean Brynjelsen, in its Motion, even though Bio-Pharm has not contested the basis for Mr. Brynjelsen's opinions. This, too, is yet another issue that the jury will have to decide.

#### 1. Whether Antrim Can Sell Ondansetron or Escitalopram Today Is Not a Proper Basis to Find No Damages

First, Bio-Pharm argues that Antrim's breach of contract claim should fail because Antrim is not legally able to sell Escitalopram. Bio-Pharm's assertion makes no sense. By approving the ANDA, the FDA was approving Antrim to market and sell Escitalopram for human use. (RSOF ¶ 18.) In other words, Antrim had the legal rights to launch Escitalopram as of the day of approval.

Second, Bio-Pharm claims that because Antrim does not have an approved ANDA for Ondansetron, it cannot sell Ondansetron and therefore is not entitled to damages. Antrim does not dispute that the FDA has still not approved Ondansetron for marketing and sale. But that does not bar Antrim from offering its damages theory to a jury. Mr. Brynjelsen has opined that:

> In addition to Escitalopram, Antrim has filed an ANDA for Ondansetron Oral Solution, which is waiting for final approval from the FDA. It is standard practice within the industry, and consistent with the FDA's guidance, to not initiate a site transfer until after the FDA's review and approval of the ANDA is completed. If a site transfer is started while the ANDA is pending, the applicant would be forced to start the ANDA process over again. Unfortu-

> nately, due to Bio- Pharm's refusal to supply Ondansetron, Antrim now must identify and transfer this product to another contract manufacturing organization ("CMO") in order to mitigate its damages. Based upon my experience, this will result in a minimum launch delay of two years since qualifying another CMO requires production of new batches, new stability data, and a site change application to the FDA.

(RSOF ¶ 71.) That is a perfectly acceptable damages theory for Ondansetron, and Bio-Pharm's motion does not contend otherwise.

Further, Antrim and Leading agreed that Leading would market and sell the Products. (ASOF ¶ 15.) Thus, Antrim would have been legally able to sell Escitalopram but for Bio-Pharm's refusal to ship. At trial, the evidence will show that Antrim and Leading were ready to launch Escitalopram, and in fact, Antrim and Leading had executed (i) an Authorized Distributor agreement whereby Leading was authorized to distribute the product on Antrim's behalf, and (ii) a Confidentiality Agreement. (RSOF ¶ 53.) The parties were also on the verge of executing a Master Collaboration Agreement (merely working out the "legalese" and, in Leading's view, it was a "done deal") when Bio-Pharm breached. (RSOF ¶¶ 56, 57, 59.) Antrim was well-positioned to sell Escitalopram, and planned on doing so, up until Bio-Pharm's breach.

### 2. The New Business Rule Does Not Apply

Bio-Pharm argues that Antrim's damages are barred by the new business rule, but its application should be rejected in this case. Contrary to Bio-Pharm's claim, there is no blanket rule that a new company cannot recover damages. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006) ("There is no inviolate rule that a new business can never prove lost profits."). The key inquiry is whether lost profits can be estimated with reasonable certainty to

be recoverable. *Wilbern v. Culver Franchising Sys., Inc.*, No. 13 C 3269, 2015 WL 5722825, at *30 (N.D. Ill. Sept. 29, 2015) ("more recent Illinois law reflects a more flexible approach").[8]

To recover lost profits in Illinois, "[a]ll the law requires . . . is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." *Schatz v. Abbott Laboratories, Inc.*, 281 N.E.2d 323, 325 (Ill. 1972). A party can establish this through evidence demonstrating the existence of an established market for the new product, because the lost profit claim is then based on fact instead of speculation. *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1237 (Ill. App. Ct. 1992); *H.B. Williamson Co. v. Ill-Eagle Enterprises, Ltd*, No. 14-CV-0575-MJR-PMF, 2015 WL 802250, at *6 (S.D. Ill. Feb. 25, 2015).

If there is a reliable method offered to calculate lost profits with reasonable certainty, especially where a company launches a new product and relies on expert testimony, the new business rule has been found not to apply. *See Herzum Software, LLC v. Guadagno*, 2014 WL 635243, at *8 (Ill. App. Ct. Feb. 14, 2014); *Euroholdings Capital & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 937 (N.D. Ill. 2009); *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, No. 02 C 2298, 2004 WL 2966947, at *5 (N.D. Ill. Nov. 24, 2004) (Kennelly, J.).

Here, Antrim's lost profits analysis is built upon reliable market data from an established industry, which Bio-Pharm does not contest in this Motion. Antrim's expert, Mr. Brynjelsen, calculated lost profits using the following general framework:

---

[8] Few states continue to apply the rule at all, and those that do apply it often take a flexible approach. *MindGames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 657 (7th Cir. 2000) ("The 'new business' rule is an attempt now widely regarded as failed to control the award of [lost profits] damages by means of a rule. The rule doesn't work because it manages to be at once vague and arbitrary."); *see also Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 920 (9th Cir. 2001) ("The new business rule is more empirical than normative, however. As an empirical matter, new businesses often cannot offer reliable proof of prospective profits. As a normative matter, if a business can offer reliable proof of profits, there is no reason to deprive it of the profits it would have garnered had the contract been performed merely because it is 'new.'"); *Hog Slat, Inc. v. Ebert*, 104 F. Supp. 2d 1112, 1120 (N.D. Iowa 2000) (same); *Gerwin v. Southeastern California Ass'n of Seventh Day Adventists*, 92 Cal.Rptr. 111, 119 (Cal. Ct. App. 1971) (same).

- He took historical generic pharmaceutical market share data from the well-established IMS database. (RSOF ¶ 67.) Bio-Pharm's own expert used the same data. (*Id.*)

- Assumed that each company in the market would obtain an equal share of the market, which is "frequently used by companies, investment banks, and financial advisors in projecting future sales." (*Id.*) Bio-Pharm's expert adopted this assumption too. (*Id.*)

- After calculating net sales based upon the gross to net discount of 35% (Bio-Pharm's expert opines that 40% applies instead), Mr. Brynjelsen calculated a product unit cost of $4. (*Id.*) Bio-Pharm's expert agreed with the $4 COGs input. (*Id.*)

While the parties believe that damages apply to different time periods, and some of the other assumptions vary, the underlying IMS data (which is anchored to data from the well-established generic pharmaceutical market[9]) and structure for calculating lost profits is similar between the parties. Antrim's expert has provided a reasonable basis to calculate lost profits and that trumps the new business rule—especially in an instance such as this where Bio-Pharm's own damages expert admitted that Antrim has in fact suffered lost profits damages and he merely disputes the amount. (ASOF ¶ 39.) And the sole reason that Antrim does not have products on the market is due to Bio-Pharm's breach, so Bio-Pharm should not be allowed to benefit from its own misconduct by asserting the new business rule.[10]

---

[9] For example, this is not an instance where there is absolutely no existing market for a certain product. Generic pharmaceutical products have existed for decades and the damages calculations here are applying reasonable (and not disputed) assumptions to actual data from that industry.

[10] Because this exception applies, the cases Bio-Pharm relies upon are inapplicable. In *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, the Court acknowledged the *Milex* established market exception but decided it did not apply because the comparison product was inherently different. 491 F.3d 625, 635 (7th Cir. 2007). In contrast, the generic drugs used for Antrim's expert's comparisons are not inherently different from the drugs at issue in the instant case. Consequently, this case more closely mirrors the subsequent litigation between the *TAS* parties, where a court held that the damage calculation for lost profits on a related claim was simple and nonspeculative because the party subject to the new business rule could prove lost profits based on comparison to a functionally equivalent product. *TAS Distrib. Co. v. Cummins, Inc.*, No. 07-CV-1141, 2011 WL 5180285, at *9 (C.D. Ill. Oct. 28, 2011). Bio-Pharm also cites to *Clutch Auto Ltd. v. Navistar, Inc.*, No. 12 C 9564, 2015 WL 1299281 (N.D. Ill. Mar. 19, 2015). In *Clutch*, the Court's application of the new business rule relied on the plaintiff's failure to demonstrate that the products it had previously sold were comparable to the products at issue in the case. *Id.* at *7. This case is inapplicable because there is no issue of comparison here; rather, Antrim's expert successfully demonstrated lost profits through a market comparison. Finally, Bio-Pharm cites to *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F.Supp. 2d 869 (N.D. Ill. 2001). The Court found the *Milex* established

### 3. Regardless, the New Business Rule Cannot Be a Basis for Summary Judgment

Antrim asserts two independent damages theories: lost profits and enterprise value. (RSOF ¶ 67; ASOF ¶ 20.) The new business rule could conceivably only apply to lost profits, which leaves intact Mr. Brynjelsen's enterprise value calculation.

## II. BIO-PHARM IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS DEFENSE OF MITIGATION OF DAMAGES

Antrim mitigated its damages, so Bio-Pharm is not entitled to partial summary judgment on its first affirmative defense of mitigation. Antrim began the process for obtaining a site change after Bio-Pharm breached the agreement by first enlisting a new manufacturer. (RSOF ¶ 76.) That process is still ongoing. Setting that fact aside, Bio-Pharm ignored the rest of the evidence reflecting Antrim's pursuit of a site change. (RSOF ¶¶ 68, 75.) Even so, the amount of time it takes for a site change is not determinative, especially where Antrim's expert testified that based on his experience (which Bio-Pharm does not appear to challenge) it would take approximately two years (and up to three) to effectuate a site change from the time that the process is initiated. (RSOF ¶ 71.)[11] Reasonable effort is all that is required to survive Bio-Pharm's asserted defense of failure to mitigate damages. *See Budnick Converting, Inc. v. Nebula Glass Int'l, Inc.*, No. 09-CV-646-DRH, 2012 WL 2017972, at *3 (S.D. Ill. June 5, 2012); *RIV VIL, Inc. v. Tucker*, 979 F. Supp. 645, 660 (N.D. Ill. 1997). Antrim satisfies this standard and this factual issue should be reserved for trial.

---

market exception inapplicable because the expert did not analyze comparable products. *Id.* at 910. Again, that is simply not the case here.

[11] Bio-Pharm argues that Antrim "admitted" that obtaining a site change takes only one year, but Antrim responded in discovery that the process "can take one year *even with the most efficient manufacturers*." (RSOF ¶ 71.)

### III. BIO-PHARM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS UNJUST ENRICHMENT CLAIM

Antrim's unjust enrichment claim is based on Bio-Pharm's theft of Antrim's products. Discovery has revealed that Bio-Pharm continues to incorporate these products into its business and is unfairly profiting from them. Bio-Pharm continued to manufacture the Products and work them through its pipeline even after Antrim filed its complaint. (RSOF ¶¶ 77-78.) This is sufficient to enable Antrim to go before a jury on its unjust enrichment claim. "In its substantive sense, unjust enrichment or restitution refers primarily to situation in which [] the defendant has received something that of rights belongs to the plaintiff (for example, he received it by mistake—or he stole it)." *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957–58 (7th Cir. 2006). By manufacturing and then wrongfully retaining the Products, Bio-Pharm "received something that of rights belongs to" Antrim.

### IV. SUMMARY JUDGMENT ON BIO-PHARM'S COUNTERCLAIM SHOULD BE GRANTED

Bio-Pharm does not dispute that it cannot prove damages on grounds that it was entitled to an ownership interest in the products. The only question then is whether Bio-Pharm's assertion that it suffered $277,000 in manufacturing costs allows Bio-Pharm's claims to survive summary judgment. To skirt around the fact that Bio-Pharm caused its own damages, Bio-Pharm argues that the doctrine of anticipatory repudiation "freed" Bio-Pharm from having to ship the products because Antrim did not give Bio-Pharm ownership in the Products. Bio-Pharm cites no evidence showing that Bio-Pharm anticipatorily repudiated the parties' agreement. Even if Bio-Pharm had evidence to support its position, summary judgment on the issue of anticipatory repudiation is improper here because the basis for Bio-Pharm's assertion of anticipatory repudiation

is one of the core factual issues in this case—namely, whether the parties agreed that Antrim would give Bio-Pharm ownership in the products (which Antrim contends it did not).

In Illinois, "[t]o win on an anticipatory repudiation claim, a [party] must prove (1) the [opposing party] repudiated the contract; (2) the conditions of the contract could be fulfilled had the [opposing party] not repudiated the contract; and (3) damages resulted from the repudiation." *Orawin Tech., LLC v. Healthcare Delivered*, LLC, No. 16 C 19, 2017 WL 4150726, at *4 (N.D. Ill. Sept. 18, 2017). However, there is no anticipatory repudiation if a party only makes doubtful or indefinite statements that it will not perform. *In re Marriage of Olson*, 528 N.E.2d 684, 686 (Ill. 1988) (citation omitted). Here, Bio-Pharm cannot show that Antrim "repudiated" the contract where the record is clear that Antrim informed Bio-Pharm several times that it would not receive ownership in the products. (RSOF ¶ 32.) Further, there was no anticipatory repudiation because Bio-Pharm made threats (i.e., doubtful and indefinite statements) that it would not ship the products unless Antrim agreed to terms that the parties had not previously agreed to. (RSOF ¶¶ 23, 59.)

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Antrim respectfully requests that the Court deny Bio-Pharm's motion for summary judgment and grant Antrim's motion for summary judgment, dismissing with prejudice Bio-Pharm's Counterclaims.

| | |
|---|---|
| January 3, 2018 | Respectfully submitted, |
| | Antrim Pharmaceuticals LLC |
| | By: /s/ W. Gordon Dobie |
| | W. Gordon Dobie<br>Jennifer A. Miller<br>Thomas G. Weber<br>WINSTON & STRAWN LLP |

35 West Wacker Drive  
Chicago, IL  60601  
(312) 558-5600

## **CERTIFICATE OF SERVICE**

The undersigned attorney, upon oath, hereby certifies that a copy of the foregoing was served via CM/ECF upon all counsel of record on January 3, 2018.

By: /s/ Jennifer A. Miller